# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **FRANCES BALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:04CV153JCH/MLM** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne B. Barnhart ("Defendant") denying the applications of Frances Ball ("Plaintiff") for a Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § § 401 et. seq., and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et. seq. Plaintiff has filed a brief in support of her Complaint. See Doc. 12. Defendant has filed a brief in support of the Answer. See Doc. 13. This case was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). See Doc. 4.

## I.
## PROCEDURAL HISTORY

Plaintiff filed an applications for disability insurance benefits and for SSI, which applications were initially denied. (Tr. 26-44, 48, 67-70). Plaintiff alleged a disability onset date of June 1, 1982. (Tr. 44). Plaintiff requested a hearing which was held before Administrative Law Judge ("ALJ") Robert E. Ritter on April 30, 2004. (Tr. 218-265). By decision dated August 26, 2004, the ALJ determined that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 14-20). On October 28, 2004, the Appeals Council denied review of the ALJ's decision. (Tr. 2-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff testified that at the time of the hearing she was 58 years old; that she is 5 foot 7 inches tall; that she weighed 156 pounds; and that her weight has not changed significantly in the last few years. Plaintiff further testified that she had completed the tenth grade; that she did not receive a GED; and that she can read and write. (Tr. 224-25).

Plaintiff testified that at the time of the hearing she was not working; that she had not worked much in several years; and that her last job with any substantial activity was working on a farm planting and chopping watermelons, which job she performed for three years. (Tr. 225). Plaintiff testified that when she worked on the watermelon farm she worked four hours a day in the fields using a hand hoe. (Tr. 242-43). Plaintiff further testified that she also worked for Arley's Home Fashions operating a sewing machine; that she worked as a stick welder, which job required that she stand, bend, and stoop and did not require her to lift or do any overhead reaching; and that she also worked for Coca-Cola putting cases of empty bottles on the line and pulling full cases off the line. (Tr. 225-27).

Plaintiff testified that she did not know why she selected June 1, 1982, as the date that she told Social Security that she became disabled and that around that time she had a stroke and received medical care after which she returned to work. (Tr. 227-28). Plaintiff also testified that she has migraine headaches, muscle spasms in her neck and shoulders, and arthritis in her right shoulder, left hip, and right ankle. (Tr. 228). Plaintiff said that her back under her shoulders hurts all the time and that she has pain in the areas in which she has arthritis. (Tr. 228). Plaintiff stated that the spasms run down her neck and in her shoulders. (Tr. 229).

Plaintiff further stated that she has suffered from migraine headaches since 1982; that at the time of the hearing she had migraine headaches about twice a month which was more frequently than

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

she had them in 1982; that the headaches affected her attendance at work while she was working at Arley's causing her to miss work "maybe" six days out of a month. (Tr. 229-30). Plaintiff stated that when she has a migraine headache she stays in bed, keeps the room dark, and takes Maxalt[1]. (Tr. 230-31). Plaintiff further that she had been using Maxalt for three months; that before that she used Tylenol; that the Maxalt helps with the migraines; that the migraines last just as long with the Maxalt as they did with the Tylenol. (Tr. 231). Plaintiff testified that her migraines are her worst problem; that she has not been to a headache specialist; that Dr. Parten suggested that she go to a headache specialist; that she could not afford to do so; that on a scale of pain from 1 to 100, with 100 being the most amount of pain she could possibly stand, Plaintiff's migraines would be a 60 or 70; that headaches put her out of commission for three days at a time; that since 1982 even if she felt well enough to work from the standpoint of her arthritis, Plaintiff would probably miss work because of migraine headaches. (Tr. 244-46).

Plaintiff testified that she had problems with arthritis when she worked for Arley's; that these problems interfered with her duties and her hands; that she had to pick up little strings of material; and that she could not pick up the material. (Tr. 231-32). Plaintiff further testified that she stopped working at Arley's because of the combination of migraines and arthritis and that she did not miss any work because of arthritis. (Tr. 232). Plaintiff stated that she thought that she had arthritic pain in her right shoulder since 1982; that this pain comes and goes; that she has this pain when she does something to aggravate it; that activities such as vacuuming the floor aggravate the pain; and that vacuuming has aggravated the pain in her right shoulder for two to three years. Plaintiff further stated

---

[1]     Maxalt is a medication used for the treatment of migraine attacks in adults.
Physicians' Desk Reference 2080 (59th ed. 2005) ("PDR").

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

that the pain in her left hip comes and goes with activity; that her right ankle gives; and that she will "just be walking and [her ankle will] turn." (Tr. 232-33).

Plaintiff testified that she has had spasms in her neck and shoulder since 1982; that at the time of the hearing she was not having spasms as often as she did in 1982; and that when she had spasms more often she was doing a lot of heavy lifting. Plaintiff stated that she had pain around her shoulder blades for three to four months prior to the hearing. When asked whether the areas of arthritic pain and the spasms, aside from the migraines, would keep her from performing her prior work Plaintiff testified that she could not say yes or no. (Tr. 234).

Plaintiff stated that her knuckles and shoulders swell; that her knuckles become red; that her knuckles bruise and turn black; and that she has a loss of range of motion of her shoulders. (Tr. 238-41). Plaintiff testified that the heaviest item she picks up around the house is a dish or a pan; that she did not think she could lift a twenty-pound bag of potatoes; that she has back and shoulder pain when she attempts to lift something over twenty pounds. Plaintiff further testified that she can peel potatoes or engage in an activity of that nature for an hour our two; that peeling potatoes aggravates her hands; that when she has aggravated her hands, the pain eases by letting her hands rest for an hour or two. (Tr. 239-40). Plaintiff further testified that she could not do a job which required six hours of standing and walking in an eight-hour day, with some lifting, carrying , pushing, and pulling of weights between ten and twenty pounds; that she could not tolerate that level of activity eight hours a day, five days per week; and that in September 2000 she could not tolerate that level of activity on a regular and consistent basis. (Tr. 234-35).

Plaintiff testified that prior to May 15, 2003, she took Tylenol and treated herself with over-the-counter medications; that on May 15, 2003, she was first prescribed Celebrex[2] for arthritic pain

---

[2]     Celebrex is a nonsteroidal anti-inflammatory drug. PDR at 3096.

4

and Propoxyphene[3]; and that Celebrex helps ease the pain. (Tr. 238-41). Plaintiff testified that her doctor "wasn't one to prescribe medication"; that the doctor did not recommend physical therapy; and that the doctor told her to keep using her joints and muscles. (Tr. 242). Plaintiff testified that she exercises to keep her joints limber and her muscles toned and that she has not been instructed by her doctor in this regard; that she walks around the house and yard for "maybe fifteen minutes, ten, fifteen, twenty minutes"; that walking for fifteen or twenty minutes tires her; and that she does not get short of breath while walking. (Tr. 251-52).

Plaintiff stated that Dr. Parten has not placed her on any restrictions; that she sees this doctor every two months; that the cost to see the doctor is $30; that she cannot afford most of her medication; that Dr. Parton gives her samples; that a month's supply of her medication would probably cost $300; that if the doctor does not have samples, Plaintiff goes without the medication; that she has never taken all the medication prescribed to her for at least a month to determine if it had much beneficial effect; and that Tylenol helped a lot of times. (Tr. 258-60).

Plaintiff testified that Dr. Parten has not taken X-rays of her joints; that he has diagnosed Plaintiff based upon her recitation of symptoms; and that she has not had any blood studies to determine or rule out types of arthritis. (Tr. 247). Plaintiff testified that she has had an MRI and CAT scan of her head two years prior to the hearing to determine if she had a tumor; that she has a tumor outside of the brain and under the skull; that the doctor told her that this was a "growth" and that an operation is not necessary; that she was told to have a scan every six months; that she has not done so because she cannot afford it; that she has not been re-examined for the tumor since its discovery; that she does not know if the tumor is growing; that she has a burning on the left side of

---

[3] Propoxyphene is a centrally acting narcotic analgesic agent. PDR at 402.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

her head at the top which causes her to believe the tumor is growing; that she has muscle spasms which draws her head to the left side; that a cold pack helps the muscle spasms. (Tr. 249-50).

Plaintiff testified that a typical day involves her vacuuming, dusting, and performing ordinary housework; that housework keeps her on her feet for an hour or two at a time; that when performing housework she takes a break and then does more housework and that she stops because of her problems; that she does not mow the yard, keep a garden, or have any hobbies; that she does not leave the house on a daily basis; that she occasionally goes to the grocery store and the post office, which are not long drives from her home; and that she can drive herself on short errands. (Tr. 236-37). Plaintiff also testified that she gets up at 7:30 a.m., takes care of her personal hygiene, makes the bed, makes toast and coffee for breakfast for herself, and dusts the tables and that the day prior to the hearing she cleansed the refrigerator for thirty minutes, vacuumed the floor for ten minutes, and then sat down and rested for one or two hours reading magazines. (Tr. 252-54). Plaintiff further stated that the day prior to the hearing she prepared potatoes and rice for supper for herself and then watched the news on television and read magazines before going to bed at 9:00 p.m. (Tr. 255-56). Plaintiff stated that she tries to rest as much as she can in the afternoons. (Tr. 254).

Plaintiff testified that over the last thirty days, vacuuming tired her out the most and drained her strength. (Tr. 260). Plaintiff further testified that her sister does most of her grocery shopping; that the heaviest thing that she lifts at the grocery store is a full gallon of milk; that she is able to lift a gallon of milk in each hand at one time; and that her sister carries the groceries from the car to the house. (Tr. 261-62). Plaintiff also testified that she does her own laundry and that the heaviest laundry basket she lifts is two to three pounds. Plaintiff stated that she does not mow the grass; that she works with flowers indoors; that she does not raise an outside garden; that she raised an outside

6

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

garden three or four years prior to the hearing; and that when she had the outside garden someone else tilled it for her. (Tr. 262-63).

Plaintiff also testified that at the time of the hearing Dr. Parten was treating her for her various problems; that he has been her doctor for five years; and that she had not seen anyone else regarding her medical problems, other than when Social Security sent her to a doctor. (Tr. 237). Plaintiff testified that her friend who lives with her is disabled and that Plaintiff's only means of support is the money that her friend pays in rent. (Tr. 257). Plaintiff testified that she does not receive food stamps. (Tr. 257). Plaintiff said that she was denied benefits in March 2000 for an application filed in December 1999; that she did not file an appeal of that decision; that she filed her current application for benefits because her condition became worse; and that the State of Missouri turned down her request for a medical card without sending her to a doctor. (Tr. 243-44).

## III.
## MEDICAL RECORDS

Records of Methodist Hospitals of Memphis reflect that Plaintiff was admitted to on June 14, 1982; that she was diagnosed with atypical migraine; and that she had a cerebral arteriogram. Hospital records dated June 15, 1982, state that Plaintiff had a right brachial arteriogram; that there was no obvious stenosis or plaque formation; that a mildly prominent infundibulum is was seen at the origin of the posterior communicating artery; and that no other abnormalities were identified. (Tr. 127). Hospital records dated June 16, 1982, state that Plaintiff was admitted for evaluation for episodes of nausea, headache across the forehead, and numbness across the side of her face and left upper extremity into her fingers. Records further state that the cerebral arteriogram was negative; that there was still some numbness in the left extremity; and that the final diagnosis was atypical migraine. (Tr. 125-26).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

On February 21, 1997, Plaintiff had a CT scan of the head with and without contrast. L.J. Bodeker, M.D., reported that the CT scan did not identify any acute intracranial abnormalities. (Tr. 171).

Records of Dennis D. Parten, M.D., reflect that on January 14, 1999, Plaintiff complained of chest pain and numbness to her left side, including the neck and head; that she stated that she has had this pain for quite awhile; and that she also complained of ankle and left hip weakness when walking. (Tr. 198).

Records of St. Bernard's Regional Medical Center reflect that Plaintiff had a routine mammogram on January 26, 1999. (Tr. 168-69).

Records of Trent R. Lamb, M.D., reflect that on August 23, 1999, Plaintiff complained of chest pain on the left side and weakness and numbness of the left arm and leg; that Plaintiff stated that over the past year she has had increasing frequency of left-sided numbness; and that she has had some mild substernal chest pain with some radiation into the left shoulder and arm. Dr. Lamb's notes reflect that he assessed Plaintiff with possible CVA[4]; that he performed an EKG, which was normal; that he ordered an MRI/MRA of the brain, an echocardiogram, and carotid doppler tests; and that he told Plaintiff to start taking baby aspirin and gave Plaintiff a prescription for Nitrostat for chest pain. (Tr. 196).

Records of St. Bernard's reflect that on August 31, 1999, Plaintiff underwent a bilateral carotid duplex doppler scan which was normal (Tr. 156, 192); that she had an echocardiogram which was also normal (Tr. 157-58); that she had an MRA test which did not reveal any high-grade stenosis (Tr. 159, 193); and that she had an MRI of her head, which did not reveal any evidence of an acute

_____

[4]     CVA is an abbreviation for cerebrovascular accident. Stedman's Medical Dictionary 440 (27th ed. 2000) ("Stedman's).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

infarction. (Tr. 160, 194). Records state that Plaintiff probably had a retrocerebellar arachnoid cyst and that it was not large enough to cause significant compression of adjacent structures. (Tr. 160).

Dr. Lamb reported on October 4, 1999, that his assessment was that Plaintiff had paresthesia on the left side without radiculopathy or signs or symptoms of CVA and that he advised Plaintiff to continue taking an aspirin every day. (Tr. 190).

Dr. Parten reported on February 1, 2002, that Plaintiff complained of left side numbness and pain in her chest. Dr. Parten's assessment on this date was chest pain and numbness in the left upper and lower left exterior. (Tr. 189).

Records of St. Bernard's reflect that on February 5, 2002, Plaintiff was given a cardiac stress test and that the test was terminated due to shortness of breath and fatigue. (Tr. 148, 150). Suresh Patel, M.D., concluded that Plaintiff had reduced effort tolerance, conditioned response, and a negative ECG for ischemia at 96% maximum heart rate, and to correlate with cardiolite images. (Tr. 151). Ammar Al-Hallak, M.D., reported that a cardiolite stress study also of this date was suboptimal because of increased gut activity and that there was a mild amount of reversible ischemia in the anteroapical area and good left ventricular systolic function with no wall motion abnormalities. (Tr. 152-53, 184-87).

On February 13, 2002, Plaintiff was examined by Eumar Tagupa, M.D. Dr. Tagupa's notes state that Plaintiff complained of chest pain radiating into her let lateral thigh and under her left shoulder blade and arm and of shortness of breath, nausea, and headache; that Plaintiff admitted to fatigue; and that she denied having headaches. Dr. Tagupa's assessment was that Plaintiff's chest pain and shortness of breath had questionable etiology, and that the abnormal stress cardiolite of February 2002 showed anterior and apical ischemia. Dr. Tagupa prescribed 325 mg aspirin daily and

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

a sublingual nitroglycerin PRN and planned that Plaintiff have "a left heart cath, possible PTCA and intracoronary artery stent." (Tr. 139-40).

On February 18, 2002, Dr. Tagupa reported that he performed a cardiac catheterization on the Plaintiff. Dr. Tagupa's impression was a normal-appearing epicardial coronary arteries, normal left ventricular systolic function with post-PVC mitral regurgitation, and no evidence of aortic insufficiency or aortic dissection. (Tr. 144-45).

Dr. Parten note's of February 14, 2003, reflect that Plaintiff complained of bad headaches, burning to the left side of the head, and joint pain in the right shoulder, elbow, and wrist and that he diagnosed Plaintiff with a headache in the left temple and osteoarthritic disease to the left side. (Tr. 179).

Dr. Parten prescribed Celebrex for Plaintiff on March 7, 2002. (Tr. 183).

Dr. Parten's notes reflect that on April 19, 2002, he removed a skin lesion from Plaintiff's mid-upper back and that on April 23, 2002, Plaintiff had stitches removed. (Tr. 180-81).

Dr. Parten completed a Medical Source Statement - Physical on March 27, 2003, for Plaintiff covering the time period from November 1, 2002, to March 27, 2003. On this form Dr. Parten stated that Plaintiff could frequently carry less than ten pounds, occasionally lift and/or carry less than ten pounds, stand or walk for a total of one hour, continuously for one hour, and sit for a total of two hours, continuously two hours; that Plaintiff was limited in her ability to push and/or pull, and was unable to do this mechanical type of work; that Plaintiff could never climb, and could occasionally balance, stoop, kneel, crouch, and bend; that Plaintiff was limited in reaching, handling, fingering, feeling, and seeing, and was unlimited in hearing and speaking; and that Plaintiff's left hand grip and sensation, her left eye's defect, and her right shoulder pain were examples of how her impaired

10

activities are limited. Dr. Parten indicated that this physical ability statement did not include consideration of pain, discomfort, and/or other subjective complaints. (Tr. 177-78).

Maynard L. Sisler, M.D., F.A.C.P., reported that he performed a physical examination of Plaintiff on April 16, 2003, pursuant to a referral from the Missouri Disability Determinations. Dr. Sisler's report states that Plaintiff stated that she had been experiencing migraine headaches for about twenty years; that these headaches were relieved to some extent by Tylenol; and that the migraines manifested as pain in the left side of her head, occurring two to three times per month, lasting two to three days at a time. Dr. Sisler further reported that Plaintiff also complained of arthritis of the right shoulder, left hip, and right ankle; that this arthritis started ten years ago; that she hurt constantly; that she was worse after trying to dress, abduct her shoulder, eat, standing two hours, sitting two hours, bending, stooping, squatting, lifting, or carrying five pounds; and that Plaintiff's arthritis was relieved somewhat by Celebrex. Dr. Sisler further noted that Plaintiff also complained of numbness in the left side of her body two to three times per month, which lasts for two to three days at a time; that this numbness is sometimes coincident with her migraine headaches; that it is associated with weakness; and that sometimes Plaintiff has fallen. Dr. Sisler noted that there has been extensive evaluation of this problem and the conclusion was made by a neurologist that it could represent minor TIA's.[5] Dr. Sisler further noted that Plaintiff has chest pains occasionally, located anteriorly, which Plaintiff described as a dull, aching pain, which comes on after walking around the block and subsides after a few minutes of rest. Dr. Sisler reported that physical examination showed limitation of motion involving the right shoulder, chiefly in abduction, forward elevation and external rotation, and that there was no limitation of motion in any other joint tested. Dr. Sisler summarized by stating that Plaintiff had a history of migranous headaches, arthritis with changes involving her

---

[5] TIA is an abbreviation for transient ischemic attack. Stedman's at 1835.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

right shoulder, and "other nondiagnostic and nonspecific symptoms that have been extensively worked up with largely negative results." (Tr. 200-202).

Dr. Parten's records reflect that Plaintiff was seen on May 15, 2003, for review of her medicines, for evaluation of her migraine headaches, and for treatment for poison ivy to the neck. Dr. Parten noted that Plaintiff had contact dermatitis to the neck and prescribed Darvocet, Medrol dose pak, and hydrocortisone cream. Dr. Parten's impression on this date was that Plaintiff had migraine headaches. (Tr. 212).

Dr. Parten notes reflect that Plaintiff was seen on July 25, 2003, for a cervical muscle strain, migraine headaches, and osteoarthritis. Dr. Parten noted that Plaintiff was taking Celebrex, Magsal, and Darvocet and that he gave Plaintiff a Medrol dosepak and Flexeril.[6] (Tr. 210).

Dr. Parten's notes reflect that on September 25, 2003, he removed lesions from Plaintiff's right upper chest and chin. (Tr. 208).

Dr. Parten's notes of April 5, 2004, reflect that Plaintiff complained that her left ear hurt and of dizziness and loss of balance. Dr. Parten's assessment on this date was that Plaintiff had lower back pain, osteoarthritis, migraine headaches, right TMJ[7], and left side vertigo. Dr. Parten prescribed hydrocodone[8] and Medrol dosepak. (Tr. 217).

## DETERMINATION OF THE ALJ

The ALJ noted that the general issues are whether the claimant is entitled to a period of disability and to disability insurance benefits under Sections 216(i) and 223, respectively, of the Social

---

[6] Flexeril relieves skeletal muscle spasm of local origin without interfering with muscle function. PDR at 930.

[7] TMJ is a colloquial abbreviation for temporomandibular joint dysfunction. Stedman's at 39.

[8] Hydrocodone is a potent analgesic of codeine used as an antitussive and analgesic. Stedman's at 840.

Security Act, and whether the clamant is disabled under Section 1614(a)(3)(A) of the Act. (Tr. 14). The ALJ stated that the Act defines "disability" as the inability to engage in any substantial gainful activity due to any medically-determined physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than twelve months. (Tr. 14).

The ALJ noted that Plaintiff's employment included jobs as a sewing machine operator, farm laborer, bottle sorter, and wire puller. The ALJ further noted that Plaintiff alleged disability on the basis of a history of stroke-like symptoms affecting her left side, migraine headaches, muscle spasms in her neck and shoulders, and swelling and stiffness of her fingers and knuckles since 1982. The ALJ also noted that other allegations included arthritis of the right ankle, left hip, and back. (Tr. 15).

The ALJ stated that 20 § § C.F.R. 404.1520(b) and 416.920(b) provide that if a claimant is working and doing substantial gainful activity, there will be a finding of not disabled regardless of his or her medical condition, age, education and work experience. The ALJ further stated that 20 C.F.R. § § 404.1572 and 416.972 define substantial gainful activity as work activity that involves doing significant physical or mental activity for pay or profit. The ALJ noted that 20 C.F.R. § § 404.1574 and 416.974 provide that work will ordinarily be found to constitute substantial gainful activity if the claimant's earnings from employment average more than $810 a month for months beginning January 2004, or averaged mor than $800 per month during 2003, or more than $780 per month during 2002, or more than $740 per month during 2001, or more than $700 per month from July 1999 through December 2000, more than $500 per month for months after 1989 and prior to July 1999, or more than $300 a month for years before 1990. The ALJ found that Plaintiff worked at substantial gainful activity after 1982, every year through 1990, and also in 1992 and 1995. The ALJ also found that Plaintiff had some earnings for every year from 1973 through 1999. (Tr. 15). The ALJ found that

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff performed substantial gainful activity at least through December 31, 1995, and probably for at least a short time into 1996, but that her work after 1996 did not constitute substantial gainful activity in terms of duration of employment or amounts of average monthly earnings. The ALJ stated that Plaintiff had a steady work record in all years through 1995, but that the work record is only one factor to be considered when assessing credibility. The ALJ then found that the preponderance of the medical and other evidence was inconsistent with the Plaintiff's allegation of disability. (Tr. 16). The ALJ noted that the medical evidence is largely emergency room visits and outpatient treatment of the same complaints of chest discomfort and/or headaches, which never occurred frequently, and with intermittent instances of medical attention. (Tr. 16).          The ALJ stated that Plaintiff's allegations that she was having serious migraines in 1982 and often enough thereafter to cause her to miss up to six days of work a month is belied by her work record which shows that she had her best earnings years after 1982, when she claimed that she became disabled. (Tr. 18).

The ALJ found that Dr. Parten's treatment notes were more credible than this doctor's March 27, 2003, assessment. The ALJ further concluded that Plaintiff's allegations, either singularly or in combination, were not credible, and because she did not have a "severe" impairment, she was not disabled. (Tr. 19).

The ALJ then stated his finding, including that: (1) Plaintiff was not disabled before some time in 1996 because she performed substantial gainful activity until that time; (2) Plaintiff has impairments including mild anteroapical signs of the cardiovascular system, a history of infrequent migraines controlled by medication, an a history of minor or acute illnesses or injuries resulting in no significant long-term limitations or complications; (3) Plaintiff's allegations of impairments, either singularly or in combination, are not credible; (4) Plaintiff has only slight abnormalities that do not significantly affect the performance of any basis work-related activities, and thus does not have a

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

"severe" impairment; and (5) Plaintiff was not under a "disability" at any time through the date of the ALJ's decision. (Tr. 20). The ALJ then determined that Plaintiff was not entitled to disability insurance benefits and was not eligible for SSI. (Tr. 20).

## V.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 416.920, 404.1529. In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. See 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. See 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. See 20 C.F.R. § § 416.920(e), 404.1520(e). The ALJ will "review [claimants'] residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id. Fifth, the severe impairment must prevent claimant from doing any other work. See 20 C.F.R. § § 416.920(f), 404.1520(f). If the claimant meets these standards, the ALJ will find the claimant to be disabled.

The ALJ's decision is conclusive upon this court if it is supported by "substantial evidence." See Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the

15

Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. See Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel,

16

147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

See Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ...." See 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). The plaintiff has the burden of proving that he has a disabling impairment. See 42 U.S.C. § 423(d)(1); Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993); Roach v. Sullivan, 758 F. Supp. 1301, 1306 (E.D. Mo. 1991).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

See Baker v. Sec'y of Health and Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id.  The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. See id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  See Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health and Human Servs., 849 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health and Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence.  See Robinson, 956 F.2d at 841; Butler v. Sec'y of Health and Human Servs., 850 F.2d 425, 426 (8th Cir. 1988).  The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).  The ALJ need only acknowledge and consider those factors. See id.  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Where the ALJ holds that the plaintiff cannot return to his past relevant work, the burden shifts to the Commissioner to show other work that the plaintiff could perform in the national economy. See Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc). This is a two-part burden. The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. See 20 C.F.R. § 404.1545(b-e). The Commissioner has to prove this by substantial evidence. See Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. See Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. See Rautio, 862 F.2d at 180; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. See Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## VI.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. See Onstead, 962 F.2d at 804. Substantial evidence

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

is that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. See Jones v. Chater, 86 F.3d 823, 826 (9th Cir. 1996). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. See Browning v. Sullivan, 958 F.2d 817, 821 (9th Cir. 1991). Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. See Jones, 86 F.3d at 826.

Plaintiff contends that the ALJ erred in finding that she does not have a "severe" disability at step two of the sequential analysis; that the ALJ erred in discounting the opinion of Dr. Parten, Plaintiff's treating physician; and that the ALJ erred in his credibility assessment. Plaintiff further contends that the ALJ did not determine Plaintiff's residual functional capacity ("RFC") and that had he done so he would have found her disabled under the Medical Vocational Guidelines.

**A.  The ALJ's Conclusion that Plaintiff does not have a "Severe" Impairment and his Failure to Give Controlling Weight to the Opinion of Dr. Parten:**

As noted by the ALJ it must be determined at Step 2 of the sequential analysis whether a claimant has a severe impairment. See 20 C.F.R. § § 416.920(c), 404.1520(c). According to the Regulations, to be severe an impairment or combination of impairments must significantly limits the claimant's physical ability to do basic work activities. See id. Upon concluding that Plaintiff's impairments were not severe the ALJ considered that the medical evidence consists largely of emergency room visits and outpatient treatment of the same complaints of chest discomfort and/or headaches, which never occurred frequently, and for which Plaintiff had intermittent instances of medical attention. (Tr. 16). The ALJ noted that Plaintiff had an emergency room visit on June 14, 1982, for these complaints, at which time Plaintiff was said to have an atypical migraine headache; that Plaintiff had the same symptoms on February 21, 1997; that a CT scan of her head at that time

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

was negative; that Plaintiff had the same symptoms on January 14, 1999; that an EKG showed mild sinus tachycardia; that a bilateral carotid duplex doppler scan was negative; that an MRI of the brain showed no high grade stenosis or signs of acute infarction; and that Plaintiff had no signs of a cerebrovascular accident or of radiculopathy despite her recurring allegation of left-sided paraesthesias. (Tr. 16).

The ALJ considered that Dr. Parten was Plaintiff's regular family doctor; that he performed a treadmill test on February 5, 2002 which produced no chest pain, arrhythmia, or signs of ischemia and that a cardiolite stress test of this dates howed a mild amount of reversible ischemia; that on February 18, 2002, Dr. Parten noted that Plaintiff reported chest pain, shortness of breath, nausea, and headache, that she had similar episodes of the last several years, and that a cardiac catheterization showed no sign of disease; that on February 14, 2003, Plaintiff told Dr. Parten she was having headaches with burning pain and pain in her right shoulder, elbow, and writs; that on March 27, 2003, Dr. Parten completed a RFC form indicating that Plaintiff could do less than sedentary work because of decreased hand grip and sensation, and a visual defect and right shoulder pain, although Dr. Parten did not mention any limitation due to headache pain. The ALJ further considered that Dr. Parten reported that he treated Plaintiff for dermatitis in May 2003; that he prescribed pain medications over the next several months; that Plaintiff pulled a muscle in July 2003; that in September 2003 Plaintiff had benign lesions removed; and that in October 2003 he removed sutures. The ALJ further considered that there were no further records from Dr. Patten. (Tr. 17).

The ALJ noted that Dr. Sisler performed a physical examination and reported pursuant to this examination that Plaintiff had some mildly limited range of motion in the right shoulder, but otherwise had only nondiagnostic and nonspecific symptoms that had been extensively worked up with largely

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

negative results.  The ALJ noted Dr. Sisler further reported that Plaintiff had only a mild loss of grip strength on the right side and only a mild loss of strength in the right upper extremity.  (Tr. 17).

The ALJ found that Plaintiff had only slight abnormalities that did not significantly limit the performance of any basic work activities and thus did not have a "severe" impairment or combination of impairments.

The ALJ did not accept Dr. Parten's assessment of March 27, 2003, which assessment the ALJ interpreted as suggesting that Plaintiff cannot do even sedentary work.[9]  Upon discounting Dr. Parten's assessment, the ALJ found that Dr. Parten's assessment was based in large part on subjective symptoms and that actual testing of Plaintiff did not show signs of actual arthritis or any serious underlying cardiovascular disease.  The ALJ further found Plaintiff may have migraine headaches, but that the medical records do not show these headaches occur often enough to require direct medical treatment or often enough to prevent the Plaintiff from maintaining a normal work schedule.  The ALJ noted that all diagnostic tests for serious brain disorder or cardiovascular or neurological disorder have been unremarkable.  (Tr. 18).

The ALJ stated that Plaintiff's allegations that she was having serious migraines in 1982 and often enough thereafter to cause her to miss up to six days of work a month is belied by her work

---

[9]    20 C.F.R. § 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which  involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  Indeed,  SSR 85-15, 1985 WL 56857, at *5, states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. ... If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." Among other things, Dr. Parten found that Plaintiff could occasionally lift less than ten pounds and that she could stand and/or walk continuously for a total of one hour.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

record which shows that she had her best earnings years after 1982, when she claimed that she became disabled. (Tr. 18). The court notes that 20 C.F.R. § 404.1574(a) provides that if a claimant has worked the Commissioner should take this into consideration when determining if the claimant is able to engage in substantial gainful activity. Moreover, when a claimant has worked with an impairment, the impairment cannot be considered disabling without a showing that there has been a significant deterioration in that impairment during the relevant period. See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). Section 404.1574(a)(1) further states that work which a claimant is forced to stop or reduce below the substantial gainful activity level after a short time because of his impairment is generally considered an unsuccessful work attempt.

The ALJ noted that Dr. Parten's March 27, 2003, Assessment was made for litigation as opposed to treatment. He further noted that Dr. Parten's treatment notes did not mention frequent or persistent joint swelling or stiffness, actual loss of grip strength or digital dexterity. (Tr. 18). The ALJ found that the same was true for Dr. Sisler's report. (Tr. 18). The ALJ found that there was no medical evidence of persistent muscle spasms of the neck or shoulders, or of any chronic, long-term pain affecting the back, right upper extremity, left hip, or right ankle. The ALJ also found that no other doctor who has treated or examined Plaintiff, other than Dr. Parten, has stated or implied that Plaintiff is disabled or totally incapacitated, or placed any specific long-term limitations on Plaintiff's ability to stand, sit, walk, bend, lift, carry, or do other basic exertional activities. (Tr. 19).

The ALJ also considered that Plaintiff has not had surgery or inpatient hospitalizations in recent years, had not been referred to physical therapy or any pain clinic, and does not take strong doses of pain medication. The court notes that the record does not reflect that Plaintiff sought or received medical treatment from June 18, 1982 until February 1997; that she did not again seek or receive medical treatment until January 1999; that she did not seek or receive medical treatment from

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

October 1999 until February 2002; and that after having a lesion removed from her back in April 2002, she did not seek or receive medical treatment until February 2003. Indeed, failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling pain. See Rautio, 862 F. 2d at 179. Seeking limited medical treatment is inconsistent with claims of disabling pain. See Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989). Additionally, where a plaintiff has not been prescribed any potent pain medication, an ALJ may properly discount the plaintiff's complaints of disabling pain. See Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994); Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994); Benskin, 830 F.2d at 884 (holding that treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain); Cruse v. Bowen, 867 F.2d 1183, 1187 (8th Cir. 1989) (holding that minimal consumption of pain medication reveals a lack of disabling pain).

Indeed, Plaintiff testified that she was unable to pay for medication and treatment. In some circumstances, failure to seek medical treatment based on inadequate financial resources may explain a plaintiff's failure. See Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). In this matter, however, there is no evidence that Plaintiff was ever refused medical treatment because of an inability to pay or that she sought treatment offered to indigents. See Riggens v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (holding that, despite a claimant's argument that he is unable to afford prescription pain medication, an ALJ may discredit complaints of disabling pain where there is no evidence that the claimant sought treatment available to indigents).

The ALJ found that Plaintiff does not have most of the signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent or frequently recurring muscle spasms, neurological deficits, and other signs. The ALJ further found that the medical evidence establishes no inability to ambulate effectively or to perform fine and gross movements effectively on a sustained

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

basis due to any underlying musculoskeletal impairment. The ALJ concluded that to the extent that Plaintiff's daily activities are restricted, they are restricted by her choice and not by any apparent medical proscription, and further found that there was no evidence of pain interfering with or diminishing Plaintiff's ability to concentrate. (Tr. 19).

The court notes that while the ALJ discounted the opinion of Dr. Parten in his Assessment that Plaintiff could not perform sedentary work, the ALJ did consider all of Dr. Parten's treatment notes. The opinions and findings of a plaintiff's treating physician are entitled to considerable weight. Indeed, if they are not controverted by substantial medical or other evidence, they are to be given controlling weight. See Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is *based on sufficient medical data*. See Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1985) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be *supported by medically acceptable clinical or diagnostic data*). Where diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. See Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987).

Moreover, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. See Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also

Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence).

Additionally, Social Security Regulation ("SSR") 96-2p states, in its "Explanation of Terms," that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996). Additionally, SSR 96-2p clarifies that 20 C.F.R. § § 404.1527 and 416.927 require that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. See Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole."). In the matter under consideration the evidence which contradicts the conclusory opinion of Dr. Parten in his Assessment comes from Dr. Parten's own treatment notes as well as from other medical treatment notes. See Chamberlain, 47 F.3d at 1494; Veal, 833 F.2d at 699. As such, the ALJ's choosing to discredit the unsupported conclusion of Dr. Parten is consistent the Regulations and controlling case law and is supported by substantial evidence on the record as a whole. See Weber v. Apfel, 164 F.3d 431, 432 (8th Cir. 1999). Additionally, the ALJ's decision

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

that Plaintiff's impairments are not severe is consistent with 20 C.F.R. § § 416.920(c), 404.1520(c) and is supported by substantial evidence on the record as a whole.

**B.     The ALJ's Credibility Findings:**

Upon reaching his determination regarding the severity of Plaintiff's impairments the ALJ discounted Plaintiff's complaints of pain.  As set forth above the ALJ properly considered Plaintiff's limited treatment and limited use of medication and her working during the period she allegedly was disabled. Additionally, the ALJ considered the following:

First, the ALJ found that the objective medical evidence on the record as a whole did not support a finding of disability. A lack of objective medical evidence detracts from a claimant's subjective complaints.  While an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, Jones, 86 F.3d at 826, the absence of an objective medical basis to support the degree of Plaintiff's subjective complaints is an important factor in evaluating the credibility of the testimony and the complaints. See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991); Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987).

Second, the ALJ considered Plaintiff's daily activities and noted that to the extent they are restricted, they are restricted by Plaintiff's choice.  The ALJ further considered that Plaintiff is able to do her own household chores, cook, grocery shop, and drive; that she watches television and visits her mother or sister at times.  The court notes that Plaintiff testified that she vacuums, dusts, and performs ordinary housework for an hour or two at a time; that she occasionally goes to the grocery store; and that she can drive herself on short errands. While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

may be considered in judging the credibility of complaints. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy, 953 F.2d at 386; Benskin, 830 F.2d at 883; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001). The court finds, therefore, that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit her allegation that she is unable to engage in substantial gainful activity. The court further finds that substantial evidence supports the ALJ's decision in this regard.

Third, the ALJ considered that no doctor other than Dr. Parten concluded that Plaintiff is unable to work. A record which contains no physician opinion of disability detracts from claimant's subjective complaints. See Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981).

Fourth, the ALJ considered that Plaintiff did not have a particularly lucrative work record. An ALJ may discount a claimant's subjective complaints for, among other reasons, that she appeared to be motivated to qualify for disability benefits. See Dodd v. Sullivan, 963 F.2d 171, 172 (8th Cir. 1992).

For the above stated reasons, the ALJ found Plaintiff's subjective complaints to be not entirely credible. The ALJ did not find that Plaintiff was not impaired at all. Instead, the ALJ found that Plaintiff's impairment's were not as severe as she alleged. See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991). The ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

See Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989); Sykes v. Bowen, 854 F.2d 284, 287 (8th Cir. 1988). See also Benskin, 830 F.2d at 882 (holding that the credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts). The court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence. Therefore, the findings of the ALJ should be affirmed.

**C.     The ALJ's Failure to Determine Plaintiff's RFC:**

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. In contrast to the first four steps of the sequential evaluation, in which the claimant carries the burden of proof, the Commissioner has the burden of establishing the claimant's RFC. See Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Additionally, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh, 222 F.3d at 451). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam ), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

RFC, however, "is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. At step 4, "the RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it." Id. At step 5, where a claimant's RFC is expressed in terms of exertional categories, it must also be determined whether the claimant can do the full range of work at a given exertional level.

The ALJ in the matter under consideration concluded at Step 1 of the sequential analysis that Plaintiff performed substantial gainful activity prior to sometime in 1996 and that, therefore, she was not disabled prior to this time. This is consistent with 20 C.F.R. § § 416.920(b), 404.1520(b). Additionally, the ALJ found at Step 2 that Plaintiff's impairments were not severe. As such, the ALJ was not required to proceed further with the sequential analysis and, specifically, was not required to determine Plaintiff's RFC or consider pursuant to Guidelines work which Plaintiff is able to perform. See Brown v Bowen, 827 F.2d 311 (8th Cir. 1987) (holding that only if at Step 2 the ALJ determines that a claimant's alleged disabling conditions are severe must the ALJ proceed with the sequential analysis and consider whether in light of the claimant's age, education, work experience, and physical and mental impairments, the claimant is disabled). The court has found above that the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

ALJ's determination that Plaintiff does not suffer from a severe impairment or combination of impairments is based on substantial evidence and consistent with the Regulations. The court also notes that the ALJ's conclusion that Plaintiff's work history prior to sometime in 1996 precludes a finding that she was disabled prior to that time is consistent with the Regulations. See § § 20 C.F.R. § § 404.1520(b), 404.1572, 416.972, 404.1574 and 416.974. As such, the ALJ was not required to proceed further than Step 2 of the sequential analysis. The court finds, therefore, without merit Plaintiff's allegation that the ALJ should have determined her RFC and that had he done so he would have found, pursuant to the Guidelines, that there was no work available for her to perform.

## VII.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in her Brief in Support of Complaint be **DENIED.** [12]

The parties are advised that they have eleven (11) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of June, 2005.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

PDF created with FinePrint pdfFactory trial version [www.pdffactory.com](www.pdffactory.com)